UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN – SOUTHERN DIVISION

RYAN CURRIER,
      Plaintiff

 -vs-                                   Case No.
                                         Hon.

PDL RECOVERY GROUP, LLC,
AVANTE TELADVANCE, INC. d/b/a CHECK 'N GO ONLINE,
MARA PFALZER,
BENJAMIN J. HOEY,
JAMIE BELSTADT,
RONALD COBB,
VERA B. RAY,
JOHN AND/OR JANE DOES 1-10, and
JOHN AND/OR JANE DOES 1-20,
      Defendants.

## COMPLAINT & JURY DEMAND

*Plaintiff, Ryan  Currier, states  the following claims for relief:*

### Introduction

1.    This action involves the illegal placement of calls by PDL Recovery Group, LLC ("PDL")

by and through its agents to the Plaintiff's place of employment and cell phone, without

Plaintiff's consent, using as automatic telephone dialing system ("autodialer"), artificial or

prerecorded messages, and live calls.  Each of the calls placed concerned a debt allegedly

owed by Plaintiff, which PDL was attempting to collect on behalf of Avante Teladvance, Inc.

d/b/a Check 'N Go Online ("Check 'N Go Online").

2.    In 1991, Congress enacted the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C.

§ 227, *et seq.*, which prohibits calls to a person on his or her cellular telephone using an

1

autodialer or an artificial or prerecorded message. 47 U.S.C. § 227(b)(1)(A)(iii).

3.   Although the collection industry has argued to the contrary, this prohibition is not limited to telemarketing calls; debt-collection calls are covered. *Brown v. Hosto & Buchan*, PLLC, 748 F.Supp.2d 847 (W.D.Tenn. 2010); *In re Rules & Regulations Implementing Telephone Consumer Protection Act of 1991, Request of ACA International for Clarification and Declaratory Ruling*, 23 F.C.C.R. 559, 561 (2008) ("ACA Declaratory Ruling"); *Brown v. Enterprise Recovery Systems, Inc.*, No. 02-11-00436-CV, 2013 WL 4506582, *5 (Tex.App. Aug. 22, 2013).

4.   Section 1692 of the Fair Debt Collection Practices Act ("FDCPA"), entitled Congressional finding and declaration of purpose, identifies that "there is abundant evidence of the use of abusive, deceptive and unfair debt collection practices by many debt collectors.  Abusive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to the invasions of individual privacy." 15 U.S.C. § 1692(a).

5.   Congress passed this statute, in large part, because the current laws were "inadequate to protect consumers." 15 U.S.C. § 1692(b).  Moreover, the purpose of the statute is to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C.§ 1692(e).

6.   PDL, by and through its agents, used an autodialer, artificial or prerecorded messages and live callers to bombard Mr. Currier with collection calls to his cell phone and place of

employment to collect on a bill allegedly owed to Check 'N Go Online.  This Complaint is

filed on behalf of Mr. Currier for damages to stop Defendants' pattern and practice of placing

calls to the place of employment and cell phones of non-debtors and/or individuals who have

not consented to be contacted in this manner.

### Jurisdiction

7.     This Court has jurisdiction under the TCPA, 47 U.S.C. § 227, *et. seq.,* the FDCPA, 15

U.S.C. §1692k(d), and 28 U.S.C. §§1331,1337.

8.     This Court may exercise supplemental jurisdiction over the related state law claims

arising out of the same nucleus of operative facts which give rise to the Federal law

claims.

### Venue

9.     The transactions and occurrences which give rise to this action, namely the collection

calls received by Plaintiff, occurred in Oakland County, Michigan.

10.   Venue is proper in the Eastern District of Michigan.

### Parties

11.   The Plaintiff to this lawsuit is Ryan Currier, a natural person and resident of South Lyon,

Michigan 48178.

12.   The Defendants to this lawsuit are as follows:

a.     PDL Recovery Group, LLC ("PDL"), a foreign corporation doing business in

Michigan, with its principal place of business located in Amherst, New York

14226.

b.     Avante Teladvance, Inc. d/b/a Check 'N Go Online ("Check 'N Go Online"), a

3

foreign corporation doing business in Michigan, with its place of incorporation

located in Cincinnati, Ohio 45236 and its business taking place online at

www.checkngo.com.

c.      Mara Pfalzer is a manager of PDL and resides in Angola, New York 14006.

d.      Benjamin J. Hoey is a manager of PDL and resides in Cheektowaga, New York

        14226.

e.      Jamie Belstadt, owns and operates PDL and V, Cobb Associates, LLC ("V,

        Cobb"),  and resides in the Buffalo/Niagra, New York area.

f.      Ronald Cobb, president of PDL. Mr. Cobb is believed to reside in the

        Buffalo/Niagra, New York area.

g.      Vera B. Ray is a manager of PDL and resides in the  Buffalo/Niagra, New York

        area.

h.      John and/or Jane Does 1-10, managers of PDL.  Plaintiff is informed and believes

        and on that basis alleges that Defendant Does 1–10 are officers, directors, or

        managing agents of PDL who are directly responsible for PDL's pattern and

        practice of abusive, deceptive, and unfair debt collection practices.

i.      John and/or Jane Does 1-20, debt collectors that are employees of PDL and use

        the following aliases, among possible others, when calling consumers to collect

        debts: Mr. Joe Kennedy, Mr. Mike Hasson, Mr. John Tracy, Mr. Arthur Reid, Mr.

        Gilbert Remierz, Mr. William Fields, Mr. Bob Buckles, Mr. David West, Mr. Jeff

        Drake, Mr. Johnny Lee, Mr. Justin Carlson, Mr. Mike Salerno, Mr. Thomas

4

Cooper, Mr. Tim Cooper, Ms. Michelle Williams, Ms. Monica Morris, Ms. Cassandra Banks, Ms. Elizabeth Childs, Ms. Reynolds, and Ms. Schaffer.

### General Allegations

13.   Mr. Currier meets the definition of a "consumer" under 15 U.S.C. § 1692a(3).

14.   PDL is a debt buyer and collection company that regularly collects debts owed to another and, therefore, meets the definition of a "debt collector" under 15 U.S.C. § 1692a(6).

15.   Check 'N Go Online provides payday loans and cash advances on its website, www.checkngo.com, and it contracted with PDL to collect its accounts.

16.   Some time prior to October 2013, PDL was engaged by Check 'N Go Online to collect a debt allegedly owed by Mr. Currier; alternatively, some time prior to October 2013, PDL purchased a debt previously held by Check 'N Go Online that was allegedly owed by Ryan Currier.

17.   Upon information and belief, Check 'N Go Online has engaged PDL under a written agreement authorizing PDL to collect from Mr. Currier.

18.   Check 'N Go Online is responsible for collection calls by its third party collector the same as if it placed the calls itself for actions in violation of the TCPA.

19.   Mr. Currier maintains a cellular phone via a "cellular telephone service" as described in 47 U.S.C. § 227(b)(1)A)(iii).

20.   Mr. Currier maintains his cellular phone for his own personal convenience, to maintain contact with family and friends, and for emergency purposes.

5

21.     Mr. Currier does not have an "established business relationship" with PDL or Check 'N Go Online as that term is defined in 47 U.S.C. § 227(a)(2).

22.     Plaintiff is informed and believes and on that basis alleges that PDL, by and through its agents, placed calls to Mr. Currier using an autodialer.

23.     PDL's alleged use of an autodialer is supported by a showing of multiple, repeated calls in a short amount of time and the presence of "dead air" at the beginning of many of the calls placed to Plaintiff's cell phone.

24.     These evidence that the calls were placed by PDL to Mr. Currier's cell phone using an "automatic telephone dialing system" ("ATDS") as defined by 47 U.S.C. § 227(a)(1).

25.     Mr. Currier never gave PDL his cellular telephone number, nor did he consent to receiving calls on that number.

26.     Each of the calls at issue in this Complaint occurred within the preceding four years.

27.     The calls from Defendants have caused numerous interruptions and disruptions of Mr. Currier's work, social engagements, and recreation.

**Specific Allegations Related to PDL, Its Associated Companies, and Management**

28.     Mr. Currier incorporates the preceding allegations by reference.

29.     PDL operates in conjunction with several associated entities out of the same addresses and using the same management and personnel.

30.     PDL uses this interlocking, corporate structure to fraudulently conceal the identities of the entities and individuals involved with the companies.

6

31.    PDL accepts service of process at PO Box 783, Amherst, New York 14226.

32.    PDL shares this PO Box with V, Cobb.  Both of these entities receive mail at this post office box.

33.    Other than this PO Box, PDL and its agents refuse to provide consumers with a mailing address or physical address where the company can be contacted.

34.    Mara Pfalzer, a manager of PDL and V, Cobb, purchased and signed for the PO Box used by both PDL and V, Cobb.

35.    Ms. Pfalzer also executed a Biennial Statement on behalf of PDL, as well as on behalf of V, Cobb, to the State of New York.

36.    Benjamin Hoey is authorized filer of PDL's Articles of Organization as well as V, Cobb's Articles of Organization with the State of New York.

37.    Jamie Belstadt – a former debt collector with National Action Financial Services – operates and manages both PDL and V, Cobb.

38.    Ronald Cobb is named as president of PDL on a settlement letter he executed and sent to Mr. Currier on May 22, 2014.  Mr. Cobb is also believed to have connections with V, Cobb as the debt collection company shares his name.

39.    Vera B. Ray is a manager of PDL and has executed corporate documents on behalf of PDL to the State of New York.

40.     PDL has been known to make unauthorized debt collection calls to the places of employment and cell phones of consumers from six separate numbers, two of which it

also lists as contact numbers on its website, www.pdlrecovery.com.

41. PDL has been the target of numerous complaints concerning its pattern and practice of abusive, deceptive, and unfair debt collection practices.

42. PDL has received an "F" rating on the Better Business Bureau ("BBB") website due to 127 complaints filed against it, 120 of those related to billing/collection issues (BBB Website, Business Review of PDL Recovery, http://www.bbb.org/upstate-new-york/business-reviews/collection-agencies/pdl-recovery-in-amherst-ny-235964678, downloaded April 29, 2014).

43. PDL has received a total of 16 consumer complaints since February 15, 2013 on scambook.com relating to its abusive and deceptive collection practices (scambook.com website, PDL Recovery Services Reviews, http://www.scambook.com/company/view/111019/PDL-Recovery-Services, downloaded February 11, 2014).

44. PDL has also received a number of complaints regarding its pattern and practice of calling consumers' places of employment from a known-PDL number, on whocallsme.com (WhoCallsMe Website, Complaints on 800-290-1065, http://whocallsme.com/Phone-Number.aspx/8002901065, downloaded February 11, 2014) and everycall.us (EveryCall Website,1-800-290-1065 Phone Number Reports, http://www.everycall.us/phone-number/1-800-290-1065, downloaded February 11, 2014).

## Specific Allegations Related to the Collections Against Mr. Currier

45. Mr. Currier incorporates the preceding allegations by reference.

8

46.     On or about October 2013, PDL communicated with Mr. Currier for the first time by
placing a call to his cell phone.

47.     The caller identified himself as Joe Kennedy, a PDL employee.  Mr. Kennedy said that he
was calling on behalf of PDL about a Check 'N Go debt that PDL was attempting to
collect.

48.     During this call, Mr. Currier provided his debit card number and set-up a payment plan
under which PDL would withdraw $50 from Mr. Currier's  account once a month until,
and ONLY until, December 16th, 2013, at which time Mr. Currier and Mr. Kennedy or
another PDL agent would discuss any further potential payments.

49.     PDL did not provide Mr. Currier with the notice required by 15 U.S.C. §1692g or M.C.L.
§ 339.918 within five days of that first communication.

50.     Since initial contact made on or about October 2013, PDL and its agents have contacted
Mr. Currier on his cell phone approximately 15 more times, even after he has requested
PDL to stop calling him.

51.     Upon information an belief, PDL has used an automated telephone dialing system to
initiate those calls, after Mr. Currier informed PDL to cease calling him.

52.      PDL has also called Mr. Currier's place of employment as many as three times a day, and
at least a total of six times after Mr. Currier advised PDL not to call his place of
employment.

53.     PDL made its first call to Mr. Currier's place of employment on October 1, 2013.  During
this initial call, Mr. Currier told PDL not to call his work again.

9

54.     Despite this request, PDL again called Mr. Currier's place of employment on December 4, 2013, three times on January 30, 2014, and again on February 6, 2014.

55.     The purpose of the calls to Mr. Currier – after Mr. Currier requested that PDL cease communication – was to harass and annoy Mr. Currier into making further payments.

56.     In an effort to stop the incessant phone calls from PDL, Mr. Currier authorized a total of five $50 payments [10/11/2013 $50 debit card payment; 10/25/2013 $50 debit card payment; 11/08/2013 $50 debit card payment; 11/22/2013 $50 debit card payment; 12/20/2013 $50 debit card payment] to be withdrawn from his bank account.

57.     Mr. Currier and PDL agreed that after these payments they would talk in December 2013 about future payment options.

58.     However, future payment was never discussed or agreed upon and instead PDL made two unauthorized withdrawals from Mr. Currier's account [01/06/2014 unauthorized $50 debit withdrawal; 01/21/2014 unauthorized $50 debit card withdrawal].

59.     After PDL began making unauthorized withdrawals, Mr. Currier closed his debit account and ceased making payments.

60.     On January 30, 2014, an agent of PDL, who identified himself as Joe Kennedy, called Mr. Currier's place of employment and spoke to his boss, Mr. Jason Fetig.

61.     In that call, Mr. Kennedy disclosed that he was collecting a debt from Mr. Currier.

62.     When Mr. Kennedy said that he was calling for Mr. Currier in an attempt to collect a debt, Mr. Fetig informed Mr. Kennedy that his employees were not to receive personal calls at work.

10

63.     Although he was hesitant, Mr. Fetig connected Mr. Kennedy's call to Mr. Currier.  After speaking for a few minutes, and after Mr. Currier refused to discuss payments, Mr. Kennedy hung up.

64.     Just a few moments later Mr. Kennedy called Mr. Currier's place of employment again, at which time Mr. Currier answered.

65.     Mr. Kennedy then demanded, "Let me speak to your boss," at which time Mr. Currier told Mr. Kennedy that he would call him after work and would not discuss any payments while at his place of employment, and then he hung up.

66.     Mr. Kennedy called Mr. Currier's place of employment for a third time on January 30, 2014 and Mr. Currier's boss, Mr. Fetig, answered.  Mr. Kennedy told Mr. Fetig that he did not like the way his phone calls were handled and said that he would be reporting Mr. Fetig's company to the Better Business Bureau as a result of Mr. Currier's conduct.

67.     The purpose of these communications to Mr. Currier's employer was to harass, shame and intimidate Mr. Currier into payment of the debt.

68.     On February 6, 2014 at 10:30 a.m., an agent of PDL, who identified himself as Mike Hasson, called Mr. Currier's place of employment and yet again spoke to his boss, Mr. Fetig, about the debt that PDL was attempting to collect.

69.     On February 6, 2014, Mr. Currier called PDL to demand that they stop making calls to his place of employment.

70.     During this call, Mr. Currier spoke to a PDL employee that identified himself as Mr. Joe Kennedy, and Mr. Currier told Mr. Kennedy that PDL had called his boss last week and

again earlier that day.

71.   Mr. Currier then demanded, as he had done many times before, that PDL not call his work again.

72.   Mr. Kennedy told Mr. Currier that PDL employees were only calling his work because he stopped making payments, and that if he wanted the calls to stop all he had to do was start making payments again.

73.   Mr Currier responded: "So that gives you the right to call my work after I asked you not to, when you clearly could call my cell phone, leave a message and just wait?"

74.   Mr. Kennedy responded by telling Mr. Currier that if he began making payments again, even if they needed to be lower payments, then he would remove his work number from his file.

75.    Mr. Kennedy also told Mr. Currier that the way PDL operates is to use any numbers given on the original loan application, and Mr. Currier should not have put his work number on the original Check 'N Go loan application if he did not want calls placed there.

76.   At the end of this call, Mr. Kennedy agreed that he "probably should have" removed Mr. Currier's work number from his file when Mr. Currier originally requested, and Mr. Kennedy assured Mr. Currier that no more calls would be made to his place of employment.

77.   On February 10, 2014, a PDL employee who identified himself as Mr. Mike Hasson called Mr. Currier's place of employment.

78.    During this call, Mr. Hasson disclosed to Mr. Currier's boss that PDL was collecting a debt from Mr. Currier.

79.    This call took place after Mr. Currier told PDL numerous times to stop making calls to his work, and after Mr. Joe Kennedy assured Mr. Currier on February 6, 2014 that no more calls would be made to his place of employment.

80.    On February 10, 2014, Mr. Currier again called PDL and spoke with an employee, who identified himself as Mr. Joe Kennedy, about the calls made to his place of employment.

81.    During the call, Mr. Currier said, "I want to make it clear not to contact me at all again", "I don't want any phone calls from PDL Recovery again", and "I am asking you not to contact me by phone again."

82.    Mr. Currier requested that PDL make any further communications by mail instead of by phone.

83.    In response to these requests, Mr. Kennedy stated: "That's not gonna happen, your debt is legally retained in my office", and "If that's how you want to go about it, I'll put the removed number right back on your file, you can file a complaint with whoever you like and we'll go from there."

84.    Once Mr. Currier told Mr. Kennedy that PDL should only contact him by mail, Mr. Kennedy placed him on hold during which time multiple recordings referencing a criminal processing company played.

85.    While Mr. Currier was on hold, PDL placed yet another unauthorized call to Mr. Currier's place of employment.

13

86.   Mr. Currier hung up and called back, at which time the following conversation took

place:

a.   "Calling my work?" -Mr. Currier;

b.   "Unfortunately you supplied the number on the original loan application.  Do you

not recall when you went online on the two separate dates and applied for the

loans?" -Mr. Kennedy;

c.   "I recall that.  Do you recall me asking you like five times not to call there?" -Mr.

Currier;

d.   "Next time you apply for a loan don't put down the place of employment number

Ryan."  -Mr. Kennedy;

e.   Then, Mr. Kennedy hung up.

87.   On February 11, 2014, Mr. Currier was forced to take a personal day from work to deal

with the aftermath of the harassing phone calls placed by PDL to his cell phone and place

of employment.

88.   On February 12, 2014 at 1:03 p.m., PDL agent Mike Hasson placed another call to Mr.

Currier's cell phone while he was still at work.

89.   In an attempt to prevent PDL from calling his place of employment again, Mr. Currier

assured Mr. Hasson that he would call him back after he left work that day.

90.   On February 12, 2014 at 5:36 p.m., Mr. Currier called PDL, and he was greeted by a

recording referencing that if a caller had been served with a court summons in regard to a

14

lawsuit or other matter pending in the office, they should have all documents ready and ask to speak with someone in the legal outsourcing department.

91.    Then, a woman who referred to herself as Stacy answered and transferred Mr. Currier's call to a PDL employee who referred to himself as Mr. Mike Hasson.

92.    Mr. Currier asked for PDL's physical address multiple times during this call, and each time Mr. Hasson said he could only provide the PO Box mailing address.

93.    Mr. Currier then provided Mr. Hasson with his current address and told him that PDL was only to contact him via mail.

94.    Mr. Hasson said that he would send a letter to Mr. Currier, which he should receive within 2-3 days, and then PDL would follow up with him a few days after that.

95.    As he had done multiple times, Mr. Currier stated that PDL was not to call him again.

96.    Near the end of the call Mr. Currier stated, "So we're clear.  You're not going to call me again", to which Mr. Hasson replied, "I will in a couple days."

97.    Mr. Currier then stated "I don't authorize it", and later, "I don't want you to contact me," to which Mr. Hasson responded, "You don't want us to contact YOU [emphasis]? Okay."

98.    Mr Currier replied, "At all.  I don't want you to contact my work, I don't want you to contact my wife–", and before he could finish Mr. Hasson hung up and ended the call.

99.    On the afternoon of May 21, 2014, PDL agent Mike Hasson placed a call to Mr. Currier's cell phone while he was still at work.

15

100.  In an attempt to prevent Mr. Hasson or another PDL agent from calling his place of employment yet again, Mr. Currier told Mr. Hasson that PDL could call him back after 4 p.m. that day, but again expressed he could not talk while he was at work, and then hung up.

101.  On May 29, 2014 at 9:41 a.m., Mr. Currier received a pre-recorded call from PDL.

102.  Upon answering this call, Mr. Currier was met with a pre-recorded voice that said RYAN CURRIER must contact PDL immediately.

103.  Since February 12, 2014, Mr. Currier has received approximately five pre-recorded calls to his cell phone from PDL, in addition to the live calls received.

104.  Upon answering these calls, Mr. Currier always heard the same message, each always recited by the same pre-recorded human voice except for the words "Ryan Currier", which were spoken by an artificial, machine-operated voice.

105.  On May 29, 2014, Mr. Currier received a proposed settlement letter from PDL, executed by "Ronald Cobb, President."

106.  This letter stated that, per prior discussion between PDL agents and Mr. Currier, there was an offer to settle the debt, in full, for $977.90 if Mr. Currier submitted payment by May 31, 2014.

107.  Mr. Currier had no such discussion regarding settlement with any agent of PDL.

108.  As a result of the acts alleged above, Plaintiff has suffered damages.

**COUNT  I – Telephone Consumer Protection Act ("TCPA")**

109.   Mr.  Currier incorporates the preceding allegations by reference.

110.   PDL and Check 'N Go Online negligently violated the TCPA, 47 U.S.C. § 227 *et seq.* in

relation to Mr. Currier.

111.   As a result of PDL and Check 'N Go Online's negligent violations of the TCPA, Mr.

Currier may recover statutory damages of $500.00 for each and every call in violation of

the statute over the last four years.

112.   Alternatively, PDL and Check 'N Go Online have knowingly and willfully violated the

TCPA in relation to Mr. Currier.

113.   As a result of PDL and Check 'N Go Online's willful violations of the TCPA, Mr. Currier

may recover treble the statutory damages ($1,500.00) for each and every call in violation

of the statute over the last four years.

**COUNT II – Fair Debt Collection Practices Act ("FDCPA")**

114.   Mr.  Currier incorporates the preceding allegations by reference.

115.   At all relevant times PDL –in the ordinary course of its business – regularly engaged in

the practice of collecting debts on behalf of other individuals or entities.

116.   PDL is a "debt collector" under the Fair Debt Collection Practices Act ("FDCPA"), 15

U.S.C. §1692a(6).

117.   At all times relevant to this complaint, PDL sought to collect a "consumer" debt from Mr.

Currier.

17

118.    PDL's actions to collect this alleged debt from Mr. Currier violated the provisions of the

FDCPA including, but not limited to, the following: 15 U.S.C. §§ 1692b(1), 1692b(2),

1692b(3), 1692c(a)(1), 1692c(a)(3), 1692c(b),1692d(5), 1692d(6), 1692e, 1692e(2),

1692e(5), 1692e(7),1692e(10), 1692f, 1692f(1), and 1692g(A).

119.    Mr.  Currier has suffered damages as a result of these violations of the FDCPA.

## COUNT  III – Michigan Occupational Code ("MOC")

120.    Mr. Currier incorporates the preceding allegations by reference.

121.    PDL is a "collection agency" as that term is defined in the Michigan Occupational Code

("MOC"), M.C.L. § 339.901(b).

122.    Mr. Currier is a debtor as that term is defined in M.C.L. § 339.901(f).

123.    PDL's foregoing acts in attempting to collect this alleged debt against Mr. Currier

constitute violations of the MOC including, but not limited to, the following:  M.C.L. §§

339.915(a), 339.915(e), 339.915(f), 339.915(g), 339.915(I), 339.915(n), 339.915(q), and

339.918(1).

124.    Mr. Currier has suffered damages as a result of these violations of the MOC.

125.    These violations of the MOC were willful.

## COUNT  III – Michigan Collection Practices Act ("MCPA") as alternative to claims under the Michigan Occupational Code ("MOC")

126.    Mr.  Currier incorporates the preceding allegations by reference.

127.    Check 'N Go Online is a "regulated person" under the Michigan Collection Practices Act

("MCPA"), M.C.L. § 445.251(g).

128.    Check 'N Go Online's foregoing acts in attempting to collect this alleged debt against Mr.

Currier constitute violations of the MCPA, including, but not limited to, the following:

M.C.L. §§ 445.252(e), 445.252(f)(I), 445.252(g), 445.252(I), 445.252(n), and §

445.252(q).

129.    Mr. Currier has suffered damages as a result of these violations of the MCPA.

130.    These violations of the MCPA were willful.

**Demand for Jury Trial**

131.    Mr. Currier demands trial by jury in this action.

**Demand For Judgment for Relief**

132.    *Accordingly, Mr. Currier requests that the Court grant:*

a.    *Equitable relief under the applicable statutes and common law.*

b.    *Actual damages for items including emotional distress, mental anguish,*
*frustration, humiliation, and embarrassment.*

c.    *Statutory damages.*

d.    *Treble damages.*

e.    *Statutory costs and attorney fees.*

f.    *Such other or further relief as this Court deems proper.*

Respectfully Submitted,


By:  s/ Amanda M. Longendyke

Amanda M. Longendyke (P77777)


LYNGKLIP & ASSOCIATES

CONSUMER LAW CENTER, PLC

Attorney For Ryan Currier

24500 Northwestern Highway, Ste. 206

Southfield, MI 48075

(248) 208-8864

Amanda@MichiganConsumerLaw.com

Dated: June 3, 2014